## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## GALVESTON DIVISION

| | | |
|---|---|---|
| **ENVTECH, INC.,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **C.A. NO. _____** |
| | § | |
| **PATRICK ANDREW DEBUSK,** | § | **JURY** |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff EnvTech, Inc. ("EnvTech") files this Original Complaint for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Defendant Patrick Andrew DeBusk ("DeBusk"), on personal knowledge as to its own actions and on information and belief as to all other matters, as follows:

## I.

## PRELIMINARY STATEMENT

1.      In 2016, trade secret theft became a RICO predicate act. Since then, DeBusk and his co-conspirators have engaged in the repeated theft of trade secrets from multiple competitors, for the financial benefit of USA DeBusk LLC ("DeBusk LLC"), which DeBusk founded and controls, and to the financial detriment of, among others, EnvTech. As a result, DeBusk and his co-conspirators are liable under

RICO for conducting the affairs of a RICO enterprise (*i.e.*, DeBusk LLC) through a pattern of racketeering activity (*i.e.*, the repeated theft of trade secrets).

2.     DeBusk LLC does not seek to compete on a level playing field. Rather, the *modus operandi* of DeBusk and his co-conspirators is to hire for DeBusk LLC its competitors' key employees who have knowledge of their former employers' trade secrets—notwithstanding the contractual duties of confidentiality, non-competition, and non-solicitation that those new employees owe to their former employers. Through this intentional approach, DeBusk LLC is able to gain a "head start" competitive advantage by stealing its competitors' trade secrets and, in turn, their business opportunities without having to incur their research and development or other startup costs.

3.     DeBusk LLC provides industrial cleaning services across numerous industries and applications. EnvTech developed and employs its confidential and proprietary one-step neutral pH chelant chemical formula and cleaning process—which involves specialized chemical blends and formulas and the know-how to implement and use the chemicals properly—in connection with the cleaning of hydrofluoric alkylation ("HF alky") units in oil refineries. Prior to its theft of EnvTech's trade secret, DeBusk LLC had never performed a chelation chemical cleaning of an HF alky unit. But after stealing EnvTech's trade secret through the

hiring of former EnvTech key employees with knowledge of the trade secret, DeBusk LLC was able to perform its first ever chelation chemical cleanings without conducting a single test of its newly-created industrial chemical products while simultaneously convincing EnvTech's former customers that DeBusk LLC's chelation chemical cleaning process was safe and successful. As a result, DeBusk LLC, and not EnvTech, obtained the significant fees associated with those jobs.

4.     EnvTech is but one of many victims of DeBusk and his co-conspirators' open-ended pattern of stealing trade secrets from the competitors of DeBusk LLC for the financial benefit of DeBusk LLC. Nonetheless, it is only EnvTech which brings this RICO action based on the illegal conspiracy to steal the trade secrets of DeBusk LLC's competitors, including now EnvTech.

## II.

## <u>PARTIES</u>

5.     EnvTech is a Nevada corporation with its principal place of business located in Reno, Nevada.

6.     DeBusk is a citizen of the State of Texas.

7.     Co-conspirator Paul Rowland Taylor II ("Taylor") is a citizen of the State of Texas. Taylor is a co-conspirator, but not a party defendant. For more than 10 years, Taylor was both a 10% minority owner of, and business development

leader for, EnvTech, during which time he learned EnvTech's trade secret.

8.     Co-conspirator Richard V. Rutherford ("Rutherford") is a citizen of the State of Oklahoma. Rutherford is a co-conspirator, but not a party defendant. Rutherford worked for EnvTech for 11 years, during which time he learned EnvTech's trade secret.

9.     Co-conspirator Dudley Hughes ("Hughes") is a citizen of the State of Texas. Hughes is a co-conspirator, but not a party defendant. Hughes is the Vice President of Technical Sales for DeBusk LLC.

10.    DeBusk LLC is a Texas limited liability company with its principal place of business located at 1005 W. 8th Street, Deer Park, Texas 77536. DeBusk is the founder, chairman, and chief executive officer of DeBusk LLC, which was founded in 2012. DeBusk LLC is a RICO enterprise engaged in interstate commerce under 18 U.S.C. § 1961(4).

## III.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under 18 U.S.C. § 1964(c). This Court also has subject matter jurisdiction under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

12.     This Court has personal jurisdiction over DeBusk because he is a Texas citizen.

13.     Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events giving rise to EnvTech's claims occurred in this judicial district. Specifically, DeBusk, Taylor, and Rutherford intentionally conspired to steal, stole, and misappropriated EnvTech's trade secret, which involves products and services used in interstate and foreign commerce, for the benefit of the RICO enterprise that DeBusk controls and operates from this judicial district (*i.e.*, DeBusk LLC).

## IV.

## BACKGROUND

### A.     EnvTech Creates And Enjoys A Valuable Business Niche.

#### 1.     EnvTech develops and employs its proprietary trade secret.

14.     For twenty years, EnvTech has been the world's premier provider of cleaning products and services for HF alky units in oil refineries, which utilize hydrofluoric acid alkylation to produce high-octane gasoline. EnvTech attained and maintained that position by developing and protecting the secrecy of its confidential and proprietary formula and techniques for performing neutral pH chelation cleaning of HF alky units in oil refineries, which accumulate iron fluoride scale inside the

units during the process of combining smaller hydrocarbon molecules into octane used in gasoline-powered engines.

15.    The chemicals and cleaning process that EnvTech uses to perform neutral pH chelation cleaning of HF alky units constitutes a state-of-the-art trade secret, which is a much safer, more efficient and faster, and more environmentally-friendly cleaning process than the traditional hydrochloric acid (HCl) and citric acid cleaning process it has largely displaced.

16.    EnvTech developed its trade secret through years of trial and error, inspiration, innovation, and continuing research and development—at significant risk and expense to EnvTech.

17.    Specifically, in 1991, Frank Straw and Henry Strodka founded EnvTech in Sacramento, California to develop a safer, more efficient, and more environmentally-friendly method to clean and neutralize HF alky units. In the early 1990s, Frank Straw persuaded a refinery manager at the Powerine Oil refinery in Santa Fe Springs, California to allow EnvTech to perform its first neutral pH chelation cleaning of an HF alky unit.

18.    After demonstrating the efficacy—including the greatly increased safety and dramatically decreased environmental impact—of its new cleaning process, EnvTech spent the next decade performing and refining neutral pH

chelation cleaning with trial-and-error adjustments to the chemicals, concentrations, temperatures, pressures, and other variables—all of which are not generally known in the industry. Due to the chemical, physical, and hydraulic variables and extremely dangerous hydrofluoric acid inside the HF alky units, the learning process was dangerous and difficult, such that only small independent and foreign refineries were initially willing to allow EnvTech to apply, adjust, improve, and demonstrate its developing methodology.

19.     By 2001, EnvTech perfected its neutral pH chelation cleaning chemistry and application methods and established both its niche and, quickly, its dominant position in the global market for cleaning HF alky units with neutral pH chelation. EnvTech has performed neutral pH chelation cleaning of HF alky units in oil refineries located in twenty-four countries on six continents. EnvTech's market success is attributable in no small part to the safety and time savings achieved by the use of its trade secret because refineries typically focus first on the safety, and then on the cost and duration, of the proposed chemical cleaning process.

20.     Worldwide, there are approximately one hundred oil refineries with HF alky units. Those HF alky units require removal of the accumulated iron fluoride scale every few years, depending on the amounts of alkylate produced and other particulars of the process and ingredients.

21.     Until recently, EnvTech was the only provider of neutral pH chelation cleaning products and services for HF alky units in oil refineries.

**2.     With its trade secret, EnvTech significantly outperforms its competitors.**

22.     Hydrofluoric acid alkylation was developed during World War II due to the proliferation of warplane engines that required higher-octane gasoline. The owners and operators of HF alky units (that EnvTech and others clean) only make money when their units are up and running and making products for sale to customers that will then use those products to create other products. However, HF alky units over time build up a scale or crust on the interior surfaces of the tanks, pipes, valves, and vessels during the hydrofluoric acid alkylation process. This scale or crust must be removed periodically in order for the HF alky units to run properly, efficiently, and safely.

23.     HF alky units must be shut down completely to clean them, perform maintenance, and make any necessary repairs. Thus, the longer the cleaning takes, the less money the owners and operators of HF alky units are able to make. These owners and operators, therefore, have a financial incentive for their HF alky units to be cleaned as quickly as possible to minimize lost revenue, which can be as much as $1 million per day. These owners and operators also have a financial incentive to have their units cleaned in a safe and environmentally-friendly manner that (i)

minimizes the risk of injury or loss of life and (ii) reduces the time and expense required to treat the toxic mixture resulting from the cleaning process before disposal.

24.     HCl-based cleaning of HF alky units, which has existed for some 80 years, traditionally uses the following three-step process involving highly corrosive acidic chemicals:

- After pumping nitrogen into a shut-down HF alky unit, a powerful acid is injected to remove the built-up scale. Aside from this acid being harmful to individuals upon contact, it also tends to damage the metal in the HF alky units, resulting in additional repair and replacement costs for the refinery owners;

- Once the acidic cleaning phase ends, the HF alky unit's metal surfaces must be inspected. However, to inspect the unit, the acid must first be neutralized. This is done by injecting a neutralizer into the units, which necessarily adds two more steps: adding, and then removing, that neutralizer; and

- Last, after the neutralizer phase, the HF alky unit must be flushed with water to prepare for another entry and inspection.

25.     Unlike EnvTech's proprietary neutral pH chelation cleaning process, the three-step HCl-based cleaning process invariably causes damage to the HF alky units and poses a danger to refinery workers due to their potential exposure to acid. Additionally, the three-step HCl-based cleaning process—which was the only method DeBusk LLC ever used until 2021—takes roughly twice as long as EnvTech's one-step cleaning process. Of course, during the three-step process, the HF alky units cannot make products or generate revenue for their owners.

26.   At a high level, EnvTech is able to clean HF alky units by using its confidential and proprietary neutral pH chelation chemical combinations and techniques to combine the resulting chelant mixture—instead of acid—with the neutralizer, which acts as a scale remover and neutralization agent in a single, simultaneous process. As a result, EnvTech (i) significantly shortened the cleaning process and down time for the HF alky units, (ii) made the cleaning process far safer, and (iii) made the effluent more environmentally friendly—all of which: (a) benefit the bottom line of the owners of the HF alky units due to less damage, less down time, less expense associated with the disposal of acidic chemicals, and, thus, less lost revenue; and (b) promote the health and well-being of the operators of the HF alky units.

**B.     DeBusk Conspires To Steal And Use EnvTech's Trade Secret To Unfairly Compete Against EnvTech, To The Financial Detriment Of EnvTech.**

27.   For 20 years until 2021, EnvTech was the *exclusive* user of its confidential and proprietary neutral pH chelation cleaning process for HF alky units. During that time, because its confidential and proprietary neutral pH chelation chemical formula and cleaning process is so unique and effective, EnvTech estimates it controlled approximately 80% of the world market for neutralizing and cleaning HF alky units to remove fluoride scale prior to further inspection, maintenance, and repairs of the units. In fact, EnvTech regularly beat out much

bigger companies for HF alky unit cleaning contracts.

28.     EnvTech's trade secret, therefore, has considerable economic value. That is why DeBusk conspired with at least Taylor, Rutherford, and Hughes to steal EnvTech's trade secret for the financial benefit of DeBusk LLC, as EnvTech discovered after suing Rutherford (pursuant to a contractual forum selection clause) in the United States District Court for the District of Nevada, Case No. 3:21-cv-48-MMD-CLB, and Taylor and DeBusk LLC in Harris County, Texas, Cause No. 2021-02657 (the "Texas State Court Lawsuit"), in January 2021, for their roles in the misappropriation of EnvTech's trade secret.

29.     In particular, based on the discovery it obtained in those two lawsuits, EnvTech learned that: (i) DeBusk LLC performed neutral pH chelation cleaning of HF alky units for the first time after hiring Taylor and Rutherford and, through them, illegally obtaining EnvTech's trade secret; and (ii) DeBusk specifically directed his co-conspirators Taylor, Rutherford, and Hughes to steal EnvTech's trade secret for the financial benefit of DeBusk LLC.

1.      **Before the theft of EnvTech's trade secret, DeBusk LLC never performed any neutral pH chelation cleaning of HF alky units.**

30.     In 2012, Taylor left EnvTech to work for DeBusk LLC, which at that time had some experience performing traditional HCl-based cleaning of HF alky units but *no* experience in performing neutral pH chelation cleaning of HF alky units.

31.    Beginning in 2019, with the encouragement of Taylor and Hughes, DeBusk decided that DeBusk LLC should seek to clean HF alky units with EnvTech's confidential and proprietary neutral pH chelation cleaning process.

## 2.    Through its hiring of Taylor and Rutherford, DeBusk LLC steals EnvTech's trade secret.

32.    As a part owner of EnvTech, Taylor was privy to the exact components of EnvTech's confidential and proprietary chemical blends and method of using those chemical blends in its neutral pH chelation cleaning process. EnvTech considers the components of its chemical blends to be so highly confidential that such information is not reduced to writing and is disclosed to only the owners of the company and—after signing confidentiality and non-disclosure agreements—the handful of employees who are required to prepare and implement the chemical blends.

33.    In email correspondence between Taylor, DeBusk, and others in 2019 and 2020, Taylor admitted he knew EnvTech's chemical blends—"so [DeBusk LLC] could" perform neutral pH chelation cleaning of HF alky units. But Taylor also informed DeBusk and others at DeBusk LLC that they needed Rutherford, given the expertise he derived from his work for EnvTech, to successfully utilize EnvTech's trade secret.

34.    Specifically, on July 3, 2019, Taylor sent an email to Hughes with the

subject line, "Meeting with Richard Rutherford." Taylor informed Hughes that Rutherford no longer worked for EnvTech and was interested in working for DeBusk LLC, and that DeBusk LLC should not attempt to clean any HF alky units without Rutherford's "level of expertise and assistance" with EnvTech's confidential and proprietary neutral pH chelation chemical formula and cleaning process. Taylor also stated: "I know the EnvTech chemistry and helped to develop it so it is another potential product for us to sell and use if we go that route. I know alky units make Andrew [DeBusk] nervous as hell because he had a bad experience with one."

35.    Taylor subsequently contacted Rutherford to seek documents and information about EnvTech's neutral pH chelation cleaning method for HF alky units. Despite his written agreement with EnvTech to maintain and not use EnvTech's confidential and proprietary information, Rutherford began secretly funneling documents and information about EnvTech's confidential and proprietary cleaning process to Taylor.

36.    In January 2020, DeBusk LLC retained Rutherford as a "consultant" to help enable it to obtain the contract to perform its first ever neutral pH chelation cleaning of an HF alky unit at a refinery owned by PBF Energy in Torrance, California (the "PBF Refinery"). DeBusk LLC was only able to secure that contract because of the knowledge and experience with neutral pH chelation cleaning that

Taylor and Rutherford obtained during their employment with EnvTech and illegally brought with them to DeBusk LLC.

37.    In particular, on February 12, 2020, Logan Bagby, the Operations Turnaround Superintendent at the PBF Refinery, asked Taylor and Hughes by email to describe for the PBF Refinery's HF alky unit business team "what HF Alkylation cleaning experience [DeBusk LLC] had over the last 5 or so years."

38.    On February 13, 2020, Taylor and Hughes responded by email to Logan Bagby, as follows:

> Logan,
> I have no clue what you feel comfortable telling [the PBF Refinery's HF alky unit business team] about the past 5 years history that they are asking about. I would not want to put that alky bundle we did for CHS on there since there were some challenges on it. *Give some hints what you think will fly and not bite us in the butt if they do any checking.*
> Paul [Taylor]

(Emphasis added.)

39.    In other words, because DeBusk LLC had no prior experience of its own performing neutral pH chelation cleaning of HF alky units and only had limited experience performing an alternative HCl-acid cleaning method, Taylor and Hughes misrepresented to the PBF Refinery that Rutherford's experience while working for EnvTech during the prior five years was actually DeBusk LLC's relevant experience performing neutral pH chelation cleaning of HF alky units. Those misrepresentations

were critical to convincing the PBF Refinery that it could rely on DeBusk LLC to safely and successfully clean its HF alky units with neutral pH chelation cleaning.

40.     Similarly, DeBusk LLC sought to use its illegally-obtained knowledge of EnvTech's confidential and proprietary neutral pH chelation cleaning process to pitch to other potential HF alky unit cleaning clients that it could perform neutral pH chelation cleaning (as opposed to HCl-based cleaning of HF alky units).

41.     DeBusk, Taylor, and Rutherford convinced EnvTech's client, Flint Hills Resources ("FHR"), to contract with DeBusk LLC to perform a neutral pH chelation cleaning of its HF alky unit at a refinery located in Corpus Christi, Texas (the "FHR Refinery"). EnvTech performed neutral pH chelation cleanings of the HF alky unit at the FHR Refinery in 2015, 2011, and 2006.

42.     DeBusk LLC also sought to perform neutral pH chelation cleaning of HF alky units for Marathon Oil Corporation, which has the most refineries with HF alky units in the United States. By email dated April 23, 2020, DeBusk LLC informed Marathon that it offers neutral pH chelation cleaning of HF alky units, which "has been well tested for decades." The email continued: "[DeBusk LLC] has excellent personnel with extensive experience cleaning HF Alky units." Tellingly, only Taylor and Rutherford were identified in the email as DeBusk LLC personnel with experience performing neutral pH chelation cleaning of HF alky units.

43.    As he admitted at his deposition in the Texas State Court Lawsuit on March 12, 2021, Taylor pitched the ability of DeBusk LLC to perform neutral pH chelation cleaning of HF alky units at the FHR Refinery and elsewhere by proclaiming that DeBusk LLC could clean HF alky units using "similar," if not "the same," cleaning process as EnvTech.

44.    Moreover, in 2020, Taylor repeatedly alerted Hughes and others in DeBusk LLC's upper management that "[DeBusk LLC] would have a nightmare coming up in January of 2021" because it did not have enough people to do the neutral pH chelation cleaning of the HF alky units at the PBF and FHR Refineries.

45.    For example, on June 16, 2020, in an email with the subject line "January night mare [sic]," Taylor told Hughes the following information that DeBusk LLC withheld from its refinery customers:

> Holy crap,
> Right now it looks like January will be impossible and I do mean impossible. . . .
> Something will have to fall by the wayside or they will fail for sure on execution. We have a grand total of four unit clearing people (Shane, Mike, Mingo and James) plus three engineers that aren't supposed to go on execution in the field any longer. There are three other hourly guys in the unit cleaning list. That's it. Just enough to almost cover FHR Corpus and nothing else.
> I sure hope they plan to do a hell of a lot of hiring.

46.    In sum, as of January 2021, even though DeBusk LLC had never performed a single neutral pH chelation cleaning of an HF alky unit, it secured

contracts to use that very process to clean HF alky units at both the PBF and FHR Refineries. It was only able to secure those contracts by stealing EnvTech's confidential and proprietary neutral pH chelation chemical formula and cleaning process and misrepresenting the knowledge and experience of former EnvTech employees Taylor and Rutherford with that cleaning formula and process as its own.

### 3.    DeBusk is personally involved in the theft of EnvTech's trade secret.

47.    On February 10, 2020, DeBusk informed Taylor and Hughes by email that he would meet them at the PBF Refinery to discuss DeBusk LLC's proposal to clean an HF alky unit at the PBF Refinery. Hughes responded to DeBusk by stating that if DeBusk LLC "eat[s] [*i.e.*, discounts or eliminates] most of the Mob/Demob [*i.e.*, mobilization/demobilization costs, including transportation, preparation, and breakdown costs] on the waterblasting, [then] I think we get [the business] 100 percent. Sweet part of this multiple service line stuff is that we can just move these charges to another service line." DeBusk responded to Hughes by approving the proposed reduction of service charges to obtain the HF alky unit cleaning business at the PBF Refinery, stating: "We'll eat the mob on HB work at Torrance. We are opening an office in LA ASAP."

48.    In an email dated January 15, 2021, one of DeBusk LLC's regional managers stated: "Andrew [DeBusk] is pushing very hard to be a top Alky

contractor." And, as that same manager wrote to many DeBusk LLC managers and Hughes in another email later that same day: "we will be having a call this coming Sunday to talk about Ph neutral HF Alky Chemical Cleaning and circulation's [sic]. Andrew DeBusk has asked you to join the call . . . we need your help. . . . Also is there anyone outside the company that has done these type of cleanings and can state that what we are doing is not an industry secret?" In an email dated January 16, 2021, after a DeBusk LLC employee responded that he used certain chelants at a single HF alky unit during his previous employment, DeBusk responded simply: "This would be huge."

49.    At his deposition taken in EnvTech's pending Texas State Court Lawsuit (in which EnvTech is pursuing its claims for trade secret misappropriation against DeBusk LLC and Taylor) on May 1, 2023, DeBusk admitted that he, along with other upper managers, decided that DeBusk LLC would use the knowledge and experience of Taylor and Rutherford with EnvTech's neutral pH chelation chemical formula and cleaning process to pursue that HF alky unit cleaning business.

50.    In particular, DeBusk admitted at his deposition that Hughes made the final decision to pursue the neutral pH chelation cleaning of HF alky units with his support and approval. Hughes, based on his communications with Taylor from approximately Summer 2019 through early 2020, knew or should have known that

EnvTech's neutral pH chelation chemical formula and cleaning process for HF alky units was an EnvTech trade secret.

51.     DeBusk also admitted at his deposition that DeBusk LLC "did use some of the same chemistry or same technology that EnvTech uses or has used" when it performed neutral pH chelation cleaning on the HF alky units at the PBF and FHR Refineries.

**C.     EnvTech Is Not The Only Victim Of The Illegal Conspiracy To Steal Trade Secrets For The Financial Benefit Of DeBusk LLC.**

52.     In addition to the theft of EnvTech's trade secret, DeBusk also conspired with others to steal the trade secrets of at least three other chemical cleaning companies so DeBusk LLC could further avoid having to compete on a level playing field.

53.     At his deposition in the Texas State Court Lawsuit, DeBusk testified that six lawsuits alleging trade secret misappropriation have been filed against him and/or DeBusk LLC, but he dismissively stated that those six lawsuits arose merely because purportedly "it was very common . . . in this industry that you get sued frivolously by your competitors when you're taking their business."

54.     In response to that testimony, EnvTech requested in discovery that DeBusk LLC provide "all documentation in your possession, custody or control discussing, describing, documenting, detailing and/or related to any frivolous

Complaints or Petitions filed against [DeBusk LLC] by industry competitors in the last five (5) years." DeBusk LLC responded by admitting that none of the six lawsuits—which, as further discussed *infra*, were filed by HydroChem LLC d/b/a HydroChem PSC ("HydroChem"), Farr Front Chemical Services LLC ("Farr Front"), and Refined Technologies, Inc. ("RTI")—were frivolous.

55.    Moreover, despite those six lawsuits against him and/or DeBusk LLC for alleged misappropriation of trade secrets, DeBusk testified that he purportedly "never thought about trade secrets" because DeBusk LLC's business scheme "is more about execution of hiring people . . . ." Of course, as it did with EnvTech, HydroChem, Farr Front, and RTI, DeBusk LLC's *modus operandi* of "hiring people" who have knowledge of, and experience with, their former employers' confidential and proprietary information is but an illegal pathway to stealing its competitors' trade secrets in violation of 18 U.S.C. §§ 1832(a)(1), (a)(3), and (a)(5).

## 1.    <u>HydroChem twice sues DeBusk LLC for trade secret misappropriation.</u>

56.    In November 2020 and January 2021, in two separate and verified lawsuits filed in Texas state court in Harris County, Texas, Cause Nos. 2020-75956 and 2021-05665, HydroChem sued its former employees Michael Martin and Matthew Warwick, as well as DeBusk LLC, for breach of contract, tortious interference, and trade secret misappropriation.

57.     The pattern of alleged conduct by DeBusk and both former HydroChem employees is functionally identical: DeBusk was personally involved in the hiring of both Martin and Warwick, induced them to violate their confidentiality and non-solicitation agreements with HydroChem, and used HydroChem's confidential and proprietary information and trade secrets to solicit HydroChem's clients and recruit other HydroChem employees for the financial benefit of DeBusk LLC and to the financial detriment of HydroChem.

58.     Indeed, HydroChem alleged in the Warwick lawsuit that:

Like [DeBusk LLC], HydroChem is an industry-leading provider of industrial cleaning and environmental services to petrochemical production, oil refining, and other energy end-market businesses. HydroChem services clients in Texas and throughout the United States. In order to thrive in this highly competitive industry, HydroChem relies on—and invests heavily in—recruiting, hiring, training and retaining its employees. These employees implement HydroChem's confidential and proprietary methods of developing and providing products and services, and help maintain the existing customer relationships and goodwill that HydroChem has developed over its many years in business. . . .

DeBusk [LLC] . . . is a direct competitor of HydroChem . . . . Warwick is working for DeBusk [LLC] and has successfully conspired with DeBusk [LLC] to poach no fewer than four HydroChem employees (with his sights set on others), so the wealth of HydroChem's confidential or proprietary information that DeBusk [LLC] has at its disposal is significant.

59.     In light of the serious allegations in both lawsuits, HydroChem and DeBusk LLC quickly resolved both lawsuits within a few months of their filing.

**2.      DeBusk LLC resolves Farr Front's trade secret misappropriation claims by buying the entire company.**

60.      In October 2020, DeBusk LLC preemptively sued Farr Front in Texas state court in Harris County, Texas, Cause No. 2020-66870, in an attempt to validate its hiring of former Farr Front key employees and minority owners Troy Harrison and Kyle Williams as part of its scheme to gain illegal access to Farr Front's confidential and proprietary information and trade secrets.

61.      At his deposition in the Texas State Court Lawsuit on May 1, 2023, DeBusk admitted that he was personally and directly involved in the hiring of Harrison and Williams for DeBusk LLC.

62.      Incredibly, DeBusk LLC's petition falsely alleged that Harrison and Williams were not violating their confidentiality and non-solicitation agreements with Farr Front because they purportedly did not possess any of Farr Front's confidential and proprietary information and trade secrets. Doubling down on that false allegation, DeBusk LLC thereafter filed in the lawsuit Harrison's declaration in which he falsely stated under penalty of perjury that: "[Harrison did] not have any of Farr Front's information."

63.      Contrary to DeBusk LLC's petition and Harrison's declaration, and as DeBusk admitted at this deposition on May 1, 2023, Harrison took with him at least 3,547 files from his Farr Front company laptop computer when he left Farr Front to

work for DeBusk LLC. And, contrary to the contention that those files were largely "personal files" that Harrison kept on his Farr Front company laptop computer, more than ninety-five percent (95%) of those files contained Farr Front's confidential and proprietary information and trade secrets.

64.     Farr Front responded to DeBusk LLC's preemptive lawsuit by filing verified counterclaims against DeBusk, DeBusk LLC, Harrison, and Williams for breach of contract, trade secret misappropriation, and conspiracy. Farr Front alleged a systematic and coordinated effort by Harrison and Williams—as directed and induced by DeBusk—to take its confidential and proprietary information and trade secrets with them to DeBusk LLC, for the financial benefit of DeBusk LLC and to the financial detriment of Farr Front.

65.     Importantly, Farr Front alleged that Harrison and Williams were key employees who it paid handsomely, including paying Harrison over $393,000 and Williams over $248,000 in 2019, plus granting them valuable Farr Front membership/ownership interests in 2019 and 2020, respectively. And, according to Farr Front, as minority owners of the company, Harrison and Williams had even greater access to Farr Front's confidential and strategic operational information.

66.     As with HydroChem, DeBusk LLC sought to steal its competitor's trade secrets by soliciting Farr Front's key employees and inducing them to violate

their confidentiality, non-solicitation, and non-competition agreements with their

former employer. In particular, Farr Front alleged that:

> Farr Front serves the refinery industry by providing services, equipment
> and technology to assist in chemical decontamination and turnaround
> operations. . . . Farr Front has developed innovative emission control
> technology, known as the 600 Series Liquid Scrubbers (the "600 Series
> LS"). This technology reduces the emissions generated from
> turnaround services compared with the services provided by Farr
> Front's competitors. . . .

> Despite knowing of the restrictions Williams and Harrison had entered
> into to protect Farr Front's confidential information and trade secrets,
> DeBusk and [DeBusk LLC] induced Harrison and Williams to take Farr
> Front's confidential and proprietary information, to resign from Farr
> Front and to join [DeBusk LLC], and to solicit current employees at
> Farr Front to join [DeBusk LLC]. . . .

> A preliminary review of Harrison's and Williams's work computers
> also shows that they emailed Farr Front's customer lists, pricing list,
> and bid information to their personal email accounts prior to leaving.
> They also asked Robert Little, Senior Field Supervisor, for the detailed
> schematics of Farr Front's 600 Series LS on their final day of
> employment. The preliminary forensic report also shows that Harrison
> and Williams . . . transferred files to external storage zip folders. . . .

> [DeBusk LLC] is a direct competitor of Farr Front, and Harrison and
> Williams will be selling the same services for [DeBusk LLC] they sold
> for Farr Front to the same customers.

67.     Within a few weeks after Farr Front filed its verified counterclaims and

an evidentiary hearing was subsequently held on its request for a temporary

injunction, DeBusk LLC and Farr Front settled their litigation. And, shortly

thereafter, as DeBusk admitted at his deposition on May 1, 2023, DeBusk LLC

agreed to acquire Farr Front; that acquisition was completed and publicly announced in September 2021. Tellingly, as DeBusk also admitted at his deposition, even though DeBusk LLC's litigation with Farr Front resulted in an "unfavorable outcome," no discipline or other adverse action was imposed by DeBusk LLC against Harrison—which is not surprising because Harrison acted at DeBusk's direction and with DeBusk's express approval.

### 3.    RTI sues DeBusk LLC for, among other things, trade secret theft.

68.    RTI is the most recently identified victim of DeBusk's scheme to steal its competitors' trade secrets by poaching their key employees who have knowledge of, and experience with, those trade secrets, for the financial benefit of DeBusk LLC.

69.    In June 2022, RTI sued DeBusk LLC and three individuals for patent infringement and theft of trade secrets under both federal and Texas law in the United States District Court for the Southern District of Texas, Case No. 3:22-cv-00197.

70.    Similar to the lawsuits filed by HydroChem and Farr Front against DeBusk and DeBusk LLC, RTI alleged that:

> While refining and perfecting the application for its patented reactor decontamination process to various refinery and plant units, Refined Technologies has developed related trade secrets and facilitative process. This proprietary information is necessary to achieve the highest levels of performance . . . .

Recently, DeBusk [LLC] has begun aggressively targeting Refined Technologies' employees and former employees, seeking to hire them away in support of [its] own operations. DeBusk [LLC] has also aggressively targeted Refined Technologies' customers. . . .

Knowing that it could not compete legitimately with Refined Technologies in the marketplace, DeBusk [LLC] . . . hired at least three of Refined Technologies' former employees having detailed knowledge of Refined Technologies' confidential and trade secret information, for the purpose of misappropriating that information and using it to illegally compete with Refined Technologies.

71.     Indeed, one of those former RTI employees is the very same Kyle Williams who left Farr Front for DeBusk LLC. RTI alleged that because "Williams ultimately became a director of business development at Refined Technologies," he "had access to all Refined Technologies' confidential and proprietary products and methods." Not surprisingly, Williams executed an employment agreement with RTI that required him to protect, and not use or disclose, RTI's confidential and proprietary information and trade secrets.

72.     In February 2023, RTI, DeBusk LLC, and the individual defendants stipulated to the dismissal of RTI's trade secret claims without prejudice so the focus of the lawsuit could be on RTI's patent infringement claims against DeBusk LLC.

73.     On February 12, 2024, Magistrate Judge Andrew M. Edison of this Court entered his Opinion and Order which construed certain claims in RTI's United States Patent No. 9,017,488 [Dkt. No. 64]. Notably, the Opinion and Order describes

DeBusk LLC's efforts to render one of the patent's claims as indefinite and ambiguous as "Poppycock," and states that the Magistrate Judge "is not buying" DeBusk LLC's efforts to "feign[] confusion"—especially when DeBusk LLC's "own expert acknowledges that such a reading [by RTI] is reasonable."

**D.    DeBusk's Proclivity For Unfair Competition Began Before He Even Founded DeBusk LLC.**

74.    In 2007, DeBusk, then the founder and majority owner of DeBusk Industrial Services Company ("DISC"), sold DISC for approximately $35 million. DISC provided many of the same industrial cleaning services now offered by DeBusk LLC. DeBusk remained the president of DISC after the sale.

75.    In connection with the sale, DeBusk executed a non-competition agreement that precluded him from competing against DISC for five years, or until March 2012. For that non-competition agreement, DeBusk received quarterly payments of $50,000, for a total of $1 million over those five years.

76.    In November 2008, DeBusk and another former owner of DISC filed a lawsuit in Texas state court seeking a declaratory judgment that their non-competition agreements were unenforceable. That lawsuit was settled less than three months later, with DeBusk stipulating that his non-competition agreement was enforceable and in strict compliance with Texas law.

77.    Nonetheless, in direct violation of his non-competition agreement, in

December 2010, DeBusk formed DeBusk Services Group ("DSG"), and in February 2011, DSG published a prominent advertisement in a national trade publication which announced the formation of DSG as a direct competitor of DISC and even touted DeBusk's prior experience as the former managing partner of DISC.

78.     Of course, as the founder and president of DISC, DeBusk was privy to DISC's confidential and proprietary information, including customer lists and relationships, business practices, and industrial cleaning methodologies.

## V.

## CAUSES OF ACTION

## COUNT ONE—VIOLATION OF CIVIL RICO

79.     EnvTech incorporates by reference each of the previous paragraphs.

80.     Pursuant to 18 U.S.C. § 1964(c), RICO provides a private right of action for treble damages to "[a]ny person injured in his business or property by reason of a violation of section 1962."

81.     Pursuant to 18 U.S.C. § 1962(c), RICO makes it "unlawful for any person employed by or associated with" a RICO "enterprise" "to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." Pursuant to 18 U.S.C. § 1962(d), RICO also makes it "unlawful for any person to conspire to violate . . . subsection . . . (c) of this section."

82.     DeBusk and his co-conspirators' illegal scheme directed at EnvTech was conducted through a RICO enterprise and a pattern of racketeering activity, in violation of 18 U.S.C. §§ 1832, 1962(c), and 1962(d).

83.     Pursuant to 18 U.S.C. § 1961(4), DeBusk LLC is a RICO enterprise because it is a legal entity under Texas law and is engaged in interstate commerce, as previously demonstrated by, among other things, its efforts to steal EnvTech's trade secret and use that trade secret for its financial benefit and to the financial detriment of EnvTech at the PBF Refinery in California and the FHR Refinery in Texas.

84.     DeBusk is employed by or associated with the RICO enterprise because he is the founder, chairman, and chief executive officer of DeBusk LLC. Pursuant to those roles, he was personally involved in, and directed, the scheme undertaken through DeBusk LLC to hire its competitors' key employees with knowledge of, and experience with, their industrial cleaning trade secrets.

85.     Pursuant to 18 U.S.C. §§ 1961(1) and (5), DeBusk and his co-conspirators participated in the RICO enterprise through a "pattern of racketeering activity."

86.     Pursuant to 18 U.S.C. § 1961(1)(B), "racketeering activity" includes "any act which is indictable under . . . [18 U.S.C.] sections 1831 and 1832 (relating

to economic espionage and theft of trade secrets) . . . ."

87.    Pursuant to 18 U.S.C. § 1832, a RICO predicate act of intentional theft of trade secrets occurs when:

> (a) Whoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will injure any owner of that trade secret, knowingly –
>
> (1) steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice or deception obtains such information; . . .
>
> (3) receives, buys, or possesses such information, knowing the same to have been stolen or appropriated, obtained, or converted without authorization; . . . or
>
> (5) conspires with one or more other persons to commit any offense described in paragraphs (1) through (3), and one or more of such persons do any act to effect the object of the conspiracy . . . .

88.    Pursuant to 18 U.S.C. § 1961(5), a "pattern of racketeering activity" means "at least two acts of racketeering, one of which occurred after the effective date of this chapter and the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity."

89.    DeBusk and his co-conspirators Taylor, Rutherford, and Hughes knowingly participated in the commission of multiple acts of racketeering in connection with the theft of trade secrets from EnvTech, as well as from at least HydroChem, Farr Front, and RTI. All those acts of racketeering occurred since the

enactment of RICO and within ten years of each other. EnvTech only discovered the additional victims of DeBusk's scheme after it filed its Texas State Court Lawsuit against DeBusk LLC and Taylor in January 2021.

90.     EnvTech has suffered and will continue to suffer financial injuries as a result of DeBusk's and his co-conspirators' efforts to steal its business, property, and profits, entitling it to relief pursuant to 18 U.S.C. §§ 1964(a) and (c).

## VI.

## **JURY DEMAND**

91.     EnvTech demands a trial by jury on all issues so triable.

## VII.

## **PRAYER FOR RELIEF**

92.     Wherefore, EnvTech requests that the Court enter final judgment in its favor and against DeBusk, providing it with the following relief:

(1)     actual, compensatory, and treble damages;

(2)     pre- and post-judgment interest;

(3)     reasonable attorneys' fees and costs;

(4)     a permanent injunction precluding the illegal use of EnvTech's trade secret; and

(5)     such other and further relief as the Court deems just and proper.

Dated:  March 8, 2024.

Respectfully submitted,

*/s/ Robert M. Millimet*

Robert M. Millimet, *Attorney-in-charge*
Texas State Bar No. 24025538
S.D. Texas I.D. No. 26386
rob@richardslawpllc.com
Jennifer S. Richards
(admission is being sought)
Texas State Bar No. 24079262
jrichards@richardslawpllc.com

**RICHARDS LAW PLLC**
6125 Luther Lane, No. 301
Dallas, Texas 75225
Telephone: (469) 480-4978

Of Counsel:

Reece Rondon
Texas State Bar No. 00794559
S.D. Texas I.D. No. 223922
rrondon@hallmaineslugrin.com
Jeffrey T. Bentch
Texas State Bar No. 24055160
S.D. Texas I.D. No. 914341
jbentch@hallmaineslugrin.com

**HALL MAINES LUGRIN, P.C.**
Williams Tower, 64th Floor
2800 Post Oak Boulevard
Houston, Texas 77056-6125
Telephone: (713) 871-9000
Facsimile: (713) 871-8692

-and-

PAGE 32

William A. Cohan, Esq.
(*pro hac vice* to be filed)
California State Bar No. 141804
bill@williamacohan.com
Gabriel L. Cohan, Esq.
(*pro hac vice* to be filed)
California State Bar No. 259449
gabriel@williamacohan.com

**WILLIAM A. COHAN, P.C.**
2888 Loker Avenue E, Suite 202
Carlsbad, California 92010
Telephone: (442) 325-1111
Facsimile: (442) 325-1126

-and-

John D. O'Connor
(*pro hac vice* to be filed)
California State Bar No. 54238
john@joclaw.com

**O'CONNOR AND ASSOCIATES**
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 693-9960
Facsimile: (415) 692-6537

**COUNSEL FOR PLAINTIFF
ENVTECH, INC.**